IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SELECT PORTFOLIO SERVICING, et al.,<br><br>          Plaintiff,<br><br>   v.<br><br>ABRAHAM VALENTINO; JOHN CHU; CORPORATE COUNSEL LAW GROUP LLP; NESZHAO CONSULTING COMPANY, LLC; KEVIN NESBITT<br><br>          Defendants.<br>_____/ | No. C 12-0334 SI<br><br>**ORDER DENYING CHU, CORPORATE COUNSEL LAW GROUP and VALENTINO'S MOTION TO DISMISS; GRANTING NESBITT AND NESZAHO'S MOTION TO DISMISS WITH LEAVE TO AMEND** |

This lawsuit is brought by loan servicing company Select Portfolio Servicing, Inc. ("SPS") and U.S. Bank National Association ("U.S. Bank") against the owners and several other affiliated parties of a residential property. Defendants Neszhao Consulting Co. ("Neszhao") and Kevin Nesbitt ("Nesbitt"), the prospective short sale purchasers of the property (the "Buyer Defendants"), have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Defendants John Chu ("Chu") and Corporate Counsel Law Group LLP ("CCLG") have filed a separate motion to dismiss pursuant to Rule 12(b)(6) and a special motion to strike the Complaint pursuant to Cal. Civ. Code § 425.16. Defendant Abraham Valentino ("Valentino"), the homeowner, has joined in the Attorney Defendants' motion to dismiss. A hearing is set for both motions on June 22, 2012. Pursuant to Civil Local Rule 7-1(b), the Court finds these matters appropriate for resolution without oral argument and hereby VACATES the hearing. After consideration of the moving papers and arguments presented, the Court GRANTS defendants Neszhao and Nesbitt's 12(b)(6) motion to dismiss WITH LEAVE TO AMEND and DENIES Defendants Chu

and CCLG's motion to dismiss pursuant to Rule 12(b)(6) and special motion to strike.

**BACKGROUND**

This case concerns allegations of fraud in a short sale of a home in Tiburon, California. Defendant Abraham Valentino was the owner of the home during all times relevant to this action. Co-defendant John Chu was Valentino's attorney in a California state court action where Valentino sought to prevent foreclosure on his home. Co-defendant CCLG is Chu's law firm. Co-defendants Neszhao and Nesbitt (collectively, "Buyer Defendants") were the prospective buyers of the home in the short sale at issue in this dispute.

In 2006, defendant Valentino purchased a home in Tiburon, CA, which was facilitated by a loan from CMG Mortgage Services, Inc. (not a party to this action) in the amount of $5.1 million. FAC ¶ 15. The loan is secured by a Deed of Trust on the property. *Id*. Plaintiff U.S. Bank, as trustee, is the current beneficiary under the Deed of Trust. *Id*. at ¶ 16. Plaintiff SPS is the current servicer of this loan.[1] *Id*. at ¶ 17.

In January 2009, a Notice of Default was recorded in the Office of the Recorder of Marin County, California, beginning non-judicial foreclosure proceedings. *Id*. at ¶18. On May 14, 2009, Valentino, through his lawyers, defendants Chu and CCLG (collectively, "Attorney Defendants"), commenced a civil action (the "Foreclosure Action") against Quality Loan Service Corporation ("QLSC") and others to challenge the legality of the foreclosure.[2] Specifically, Valentino alleged that defendants' Notice of Default was illegally recorded for failure to comply with Civil Code § 2923.5. To resolve the Foreclosure Action, plaintiff SPS, the current servicer of the loan, and U.S. Bank, the current trustee, entered into a settlement agreement (the "Settlement Agreement") with Valentino. *Id*.

---

[1] SPS became the servicer of the loan around June 2010.

[2] *See Valentino v. Quality Loan Service Corp. et al.*, Marin Superior Court Case No. CIV 092396. Dkt.42, Chu Aff., Ex. A. QLSP was the original trustee on the Deed of Trust. Dkt. 42, Chu Aff. ¶4.

2

at ¶ 20. The Settlement Agreement expressly states that it is effective on September 12, 2011.[3] *Id.*; Chu Aff., Ex. 1B. In the Settlement Agreement, SPS and U.S. Bank agreed to halt foreclosure proceedings until June 1, 2012 to allow Valentino seven months to complete a short sale of the property. FAC ¶¶ 21-22. During that seven-month period, Valentino agreed to make monthly payments of $12,000 to SPS to begin on November 1, 2012. *Id.* at ¶ 21. Per the Settlement Agreement, SPS has sole discretion to accept or deny any proposed short sale of the property, and if Valentino failed to make timely payments, plaintiffs could immediately foreclose on the property. *Id.* at ¶¶ 22-23. The Settlement Agreement also states that each party shall bear its own costs and attorney's fees. *Id*. at ¶ 24.

On October 4, 2011, Attorney Defendants presented SPS a proposed short sale of the property for $5,990,000 with Buyer Defendants as the prospective buyers. *Id*. at ¶ 26. Brian Gunn, counsel for SPS and U.S. Bank, contacted Chu to reject the proposed short sale because it allocated $500,000 to the second lien holder and $35,000 for attorney's fees. *Id*. at ¶ 28. On October 7, 2011, Chu left Gunn a voicemail apologizing that the proposed short sale offer allocated money for attorney's fees and to the second lien holder. *Id*. at ¶ 29. Chu then promised to submit a revised proposal compliant with SPS's requirements. *Id*. at ¶ 30. On November 10, 2011, Chu submitted a revised short sale proposal for $5.1 million with no money for the second lien holder or for attorney's fees, and with Buyer Defendants as the prospective buyers. *Id*. at ¶¶ 29-31. Although Valentino did not pay SPS the $12,000 payment due on November 1 and December 1, 2011 per the Settlement Agreement, SPS did not initiate foreclosure. *Id*. at ¶¶ 32-33. SPS approved the revised proposed short sale on December 5, 2011. *Id.*

Plaintiffs allege that on January 12, 2012, the day the short sale was to close, Michael Zhao, Buyer Defendants' real estate agent, informed SPS that defendants were attempting to defraud plaintiffs. *Id*. at ¶ 34. The FAC alleges that Zhao told SPS that defendants prepared two sets of purported short sale documents. *Id.* One set, which was given to SPS for its review, provided that no proceeds from the sale would be directed to the Attorney Defendants or would be used to satisfy any junior liens on the property. *Id.* at ¶ 35. The second set of documents, which reflected a higher purchase price than the documents presented to SPS, provided that some proceeds would go to the Attorney Defendants as

---

[3] Valentino signed the Settlement Agreement on October 25, 2011 and SPS and U.S. Bank signed on November 10, 2011. Chu Aff., Ex. 1B.

3

well as other junior lien holders. *Id.* Plaintiffs allege that defendants intended the second set of documents to be recorded as the actual transaction. *Id.*

On January 20, 2012, SPS filed a lawsuit against defendants, which this Court dismissed with leave to amend for plaintiff's failure to plead the allegations of fraud with sufficient particularity as required by Fed. R. Civ. P 9(b). *See* Dkt. 37.

In the first amended complaint ("FAC"), U.S. Bank was with joined SPS as a plaintiff, and claims were asserted for: (1) intentional misrepresentation; (2) false promise; (3) negligent misrepresentation; (4) civil conspiracy to commit fraud; (5) tortious interference with prospective economic advantage against Buyer Defendants; and (6) breach of contract against Valentino. Plaintiffs allege that defendants submitted to SPS a revised short sale proposal that defendants had "no intention of actually performing." *Id.* at ¶ 3. SPS asserts that it relied upon defendants' representations and devoted time and expense toward reviewing the purported short sale proposal and refrained from proceeding with efforts to foreclose the property, thus incurring carrying costs for the loan. *Id*. ¶¶ 46-47, 61-62. For each of their first four causes of action, plaintiffs claim damages for $266,077 and punitive damages for $2,394,693. Plaintiffs also claim $72,000 in damages for their breach of contract claim against Valentino.[4] Prayer for Relief ¶¶1-7.

Buyer Defendants move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Attorney Defendants also move to dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6) based on the *Noerr-Pennington* doctrine and the California Civil Code § 47(b) "litigation privilege." Furthermore, Attorney Defendants specially move to strike the FAC pursuant to California's anti-SLAPP statute, California Code of Civil Procedure § 425.16 *et seq.* Valentino joined Attorney Defendants' motion to dismiss.

**LEGAL STANDARD**

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court examines the complaint

---

[4] Plaintiffs have yet to determine damages for their claim of interference with prospective economic advantage as against Buyer Defendants.

4

to determine if it states claims upon which relief can be granted. *Gonzalez v. Metropolitan Transp. Auth.*, 174 F.3d 1016, 1018 (9th Cir. 1999). The Court "may not look beyond the complaint to [the] plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (holding that new allegations made in plaintiff's opposition to defendant's motion to dismiss, but not found in complaint, are "irrelevant for 12(b)(6) purposes"). However, the Court may consider any documents of which it takes proper judicial notice. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

The Court must take all factual allegations found in the complaint as true and construe them in the light most favorable to the plaintiff. *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). In order to avoid dismissal for failure to state a claim, the plaintiff has the burden of submitting a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, such a showing "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 350 U.S. 544, 555 (2007). Rather, the complaint must contain factual allegations that "raise a right to relief above the speculative level." *Id*.

When the claims in the complaint contain allegations of fraud, the "party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard requires that the allegations regarding the circumstances of the alleged fraud be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Allegations of fraud must contain the "the who, what, when, where, and how" of the alleged misconduct. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003) (internal citations omitted). When alleging that a particular statement was made with the intent to defraud, "the plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (internal quotations omitted).

In addition, even where fraud is not a necessary element of a particular cause of action, a plaintiff may choose to allege that fraudulent conduct forms the basis for that cause of action. Where the plaintiff does so, those allegations of fraud will also be subject to Rule 9(b)'s pleading requirements

despite the fact that the cause of action does not *require* that fraud be alleged. *Id.* at 1103-04. Finally, it is well-established in the 9th Circuit that Rule 9(b) applies to state-law causes of action brought in federal court. *Id.* at 1103.

In the event that the Court dismisses a complaint because plaintiff has not met its burden of pleading in relation to either a failure to state a claim under Rule 12(b)(6) or a failure to plead fraud with specificity under Rule 9(b), "leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." *Id.* at 1108 (*quoting Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (alteration in original)). This liberality with which courts are to grant leave to amend is consistent with Rule 15(a)(2)'s requirement that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

## DISCUSSION

The Court will first address the Attorney Defendants' motion to dismiss, in which Valentino joined. The Court will then turn to the Buyer Defendants' separate motion to dismiss.

### I. Defendants Chu and CCLG's Motion to Dismiss

The motion to dismiss filed by Chu and CCLG ("Attorney Defendants") argues that Plaintiffs' claims are barred as a matter of law by the *Noerr-Pennington* doctrine because the allegedly fraudulent communications arose from Attorney Defendants' petitioning activity in the foreclosure action. In the alternative, Attorney Defendants argue that the FAC should be stricken as a SLAPP suit under California Code of Civil Procedure § 425.16 for the same reason. Attorney Defendants further argue that the conduct giving rise to plaintiff's claims is absolutely privileged by the California Civil Code § 47(b) litigation privilege. These theories will be addressed in turn.

#### A. The *Noerr-Pennington* Doctrine

The Attorney Defendants argue that Plaintiffs' claims against them are barred as a matter of law by the *Noerr-Pennington* doctrine, because the allegedly fraudulent communications arose from Attorney Defendants' petitioning activity in the foreclosure action. The *Noerr-Pennington* doctrine

6

"ensures that those who petition the government for redress of grievances remain immune from liability for statutory violations, notwithstanding the fact that their [petitioning] activity might otherwise be proscribed by the statute involved." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000). It derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const., amend I. The doctrine arose in the antitrust context, but has since been expanded to cover a variety of areas of law. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983) (applying the doctrine in the labor relations context); *Thomas v. Housing Authority of County of Los Angeles*, 2005 WL 6136440 (C.D. Cal. 2005) (Federal Housing Act and California Fair Employment and Housing Act context); *Premier Medical Management, Inc. v. California*, 136 Cal. App. 4th 464, 478 (Ct. App. 2nd 2006) (Workers Compensation). In *Sosa v. DirecTV, Inc.*, the Ninth Circuit stated that "the *Noerr-Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause . . . In determining whether the burdened conduct falls under the protection of the Petition Clause, we must give adequate 'breathing space' to the right of petition." 437 F.3d 923, 931 (9th Cir. 2006) (holding pre-litigation demand letters were protected by the doctrine) (*citing BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002)).[5]

The *Noerr-Pennington* doctrine protects "not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit.'" *Id.* at 934-35 (*citing Columbia Pictures Indus., Inc. v. prof'l Real Estate Investors, Inc.* 944 F.2d 1525, 1528-29 (9th Cir. 1991), *aff'd* 508 U.S. 49). The Ninth Circuit has held that "communications between private parties are sufficiently within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning activity." *Sosa*, 437 F.3d at 935.

The question before this Court is whether the alleged communications by Attorney Defendants were "conduct incidental to the prosecution" of the underlying foreclosure-related lawsuit (the "Foreclosure Action"). The communications at issue are Chu's October 7, 2011 voice mail to SPS

---

[5]An exception to *Noerr-Pennington* immunity exists if a plaintiff adequately pleads that defendant has engaged in "sham" petitioning. *Professional Real Estate Investors, Inc.v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-62 (1993). Because SPS does not argue that the Foreclosure Action was a "sham," the Court does not address this exception.

7

1 apologizing for the first proposed short sale offer (offering a sale price of $5,990,000, with a $4,991,000
2 payout to SPS, $500,000 to the second lien holder, and $35,000 to Chu) and stating that a proposed short
3 sale compliant with Plaintiffs' terms was forthcoming; and the November 10, 2011 email with the
4 second proposed short sale offer (offering $5,100,000 to SPS only). FAC ¶¶ 26-31. Plaintiffs argue that
5 both communications were fraudulent in that no defendant had any intention of completing a short sale
6 on the proposed terms, and that the communications were merely intended to induce Plaintiffs to delay
7 foreclosure and meant to hide the actual sale of the home at a far higher price, where defendants could
8 pocket the excess or otherwise distribute it as they chose. FAC ¶¶ 40-43.

9      Attorney Defendants argue that the communications were incidental to the prosecution of the
10 Foreclosure Action. The Foreclosure Action was filed by Valentino through Chu and CCLG in Marin
11 County Superior Court on May 14, 2009. The Settlement Agreement was entered into that court's
12 record on September 12, 2011; however, the agreement was not reduced to writing until November 10,
13 2011. Attorney Defendants therefore argue that because "at the time that those statements [on October
14 7 and November 10, 2011] were made, the arms-length settlement agreement between the parties had
15 not been executed; Plaintiff did not execute the written settlement agreement until November 10, 2011
16 as a direct result of the statements made by [Attorney Defendants] regarding the revised short sale
17 proposal for the Subject Property. Thus, not only were the allegedly actionable communications made
18 during a pending action, they were sufficiently 'related to' the litigation and the related settlement
19 agreement to fall within the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine."
20 Atty. Def.'s MTD at 10 (*citing Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1185 (9th Cir. 2005)).
21 Attorney Defendants characterize plaintiffs' allegations as a complaint that the communications
22 "fraudulently induc[ed] plaintiff into entering" the Settlement Agreement. *Id.* at 2. Thus, in Attorney
23 Defendants' conception of the FAC, the communications were part of the process of executing, or at
24 least enforcing, the Settlement Agreement. Therefore the communications were conduct incidental to
25 the Foreclosure Action.

26      Plaintiffs dispute this characterization of the FAC. Plaintiffs argue that the Foreclosure Action
27 "is merely the incidental back-story to the fraud that forms the basis for the Attorney Defendants'
28 liability; their liability does not 'arise' from [that] litigation at all." Pl.'s Opp. to Atty. Def.'s MTD at

6. According to Plaintiffs, the Foreclosure Action had been dismissed on September 12, 2012 and the Settlement Agreement became enforceable that day, prior to the Attorney Defendants' fraudulent communications. In Plaintiffs' conception of this lawsuit, the communications were not made to induce Plaintiffs to enter the Settlement Agreement; instead, they were made for the wholly independent purpose of defrauding Plaintiffs out of time and money.

Whether or not the *Noerr-Pennington* doctrine applies in this case turns in large part on the related questions of when the Foreclosure Action ended and the Settlement Agreement became enforceable. If, as Attorney Defendants contend, the Settlement Agreement was not executed until November 10, 2011 following receipt of the fraudulent proposed short sale offer, and the Foreclosure Action remained live until November 17, 2011 when the Settlement Agreement was filed with the state court, it would be likely that the fraudulent communications were conduct incidental to the Foreclosure Action. If, on the other hand, the Settlement Agreement was executed and the Foreclosure Action dismissed on September 12, 2011, it would be less likely that the communications were incidental to that action.

After reviewing the allegations and the judicially noticed exhibits, the Court finds that Plaintiffs are correct: the Settlement Agreement was executed on September 12, 2011 and the Foreclosure Action was dismissed that day. The "Minute Order" of the Marin Superior Court that day states:

> Attorney John Chu appeared for and with plaintiff, Abraham Valentino. Attorney Brian Gunn appeared for Defendant and with Bryan Norton, representative of Select Portfolio Services. The case has been reported settled. The respective parties are sworn. Mr Chu recites settlement into the record. The parties understand and agree to the terms and conditions therein. Motion granted as to plaintiff's oral request to dismiss matter with prejudice. It is Ordered: continued to October 20, 2011 at 8:30 A.M. in Department B for receipt of the settlement agreement. No appearance necessary if agreement has been submitted. All future dates previously set are hereby vacated . . .
>
> Case disposed before trial; dismissed - other reasons with prejudice. Case disposed in entirety.

Chu Decl., Ex. C (Foreclosure Action Register of Actions) at 8. The case was dismissed with prejudice on Attorney Defendant Chu's motion. The California Code of Civil Procedure provides that an action may be dismissed "by oral or written request [by the plaintiff] at any time before the actual commencement of trial . . ." Cal. Code. Civ. P. 581(b)(1). That is what occurred at the hearing: Chu

9

1 dismissed his client's action.

2 Attorney Defendants are correct that the case nominally remained "open" for the submission of
3 the written agreement. However, this appears to have been *pro forma* only. The minute entry of the
4 November 17, 2011 date for submission of the Settlement Agreement (after the date was moved from
5 October 20, 2011) illustrates this: SPS's attorney Brian Gunn appeared, but Attorney Defendants made
6 no appearance. Chu Decl., Ex. C at 8. The minute entry only states that "Counsel reports that case has
7 settled and notice of dismissal was submitted to the court. The matter taken off calender at the request
8 of/order of by the court." *Id.* The court does not further dismiss or otherwise "close" the case; it simply
9 takes it off calender. Moreover, according to Plaintiffs, attorney Gunn's appearance on November 17,
10 2011 was simply to inform the judge assigned to the case, who had been absent on September 12, 2011,
11 what had occurred on that date. Gunn Decl. ¶ 12.

12 Other evidence related to the settlement supports an execution/dismissal date of September 12,
13 2011. The first sentence of the written Settlement Agreement states that, "[t]his Settlement Agreement
14 and Release of Claims is made and entered into effective September 12, 2011, by Abraham Valentino,
15 Select Portfolio Servicing, Inc, and U.S. Bank National Association . . . for the purpose of resolving by
16 compromise settlement, all claims, liabilities, and disputes arising out of a dispute between the parties."
17 Chu Decl., Ex. B (Settlement Agreement) at ¶ 1. The Notice of Dismissal filed with the state court on
18 November 11, 2011 states: "Please take notice that, by minute order posted on September 12, 2011, the
19 court has dismissed the action with prejudice, pursuant to the settlement read into the record on
20 September 12, 2011." Gunn Decl., Ex. 1 (Notice of Dismissal) at 1.

21 In sum, the allegations and judicially noticed evidence suggest that the case was judicially settled
22 on September 12, 2011, and the Foreclosure Action was dismissed with prejudice that same day. When
23 ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true,
24 construe the pleadings in the light most favorable to the nonmoving party, and draw all reasonable
25 inferences in favor of the plaintiff. *See Association of Los Angeles Deputy Sheriffs v. Cty. of Los*
26 *Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). Here, that leads the Court to conclude that the Foreclosure
27 Action was over and the Settlement Agreement in force as of the time the fraudulent communications
28 were made. The Court therefore disagrees with Attorney Defendants that the fraudulent

10

communications were meant to induce Plaintiffs to entering the Settlement Agreement, because Plaintiffs had *already* entered the Settlement Agreement.

This does not end the inquiry, as Attorney Defendants argue in the alternative that the *Noerr-Pennington* doctrine protects activity that occurs related to the enforcement of settlement agreements and following the entry of judgment. In other words, Attorney Defendants believe that their communications were still part of the petitioning activity of the Foreclosure Action. In support, Attorney Defendants cite *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525 (9th Cir. 1991) and *Thomas v. Housing Authority of the Cty. of Los Angeles*, 2005 WL 6136440 (C.D. Cal. 2005) (Morrow, J.).

In *Columbia Pictures Industries*, Columbia Pictures brought a copyright infringement action against hotel operators, challenging operators' rental of video discs to hotel guests. Defendant Professional Real Estate Investors ("PREI") brought antitrust counterclaims based in part on plaintiff Columbia Pictures' refusal to enter into settlement negotiations with respect to Columbia's copyright infringement suit. PREI claimed Columbia Pictures engaged in a "concerted refusal to deal" by failing to agree to license the videos, a settlement offer made by PREI after Columbia Pictures brought suit. The Ninth Circuit held that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis of the antitrust liability." *Columbia Pictures*, 944 F.2d at 1528. The Ninth Circuit concluded that *Noerr-Pennington* applied to such conduct, and the Supreme Court affirmed. *Id.* at 1529, *aff'd*, 508 U.S. 49.

In *Thomas*, the Housing Authority of the County of Los Angeles ("HACOLA") brought an unlawful detainer action against a family of tenants to remove them from their housing based on tenants' nephew's alleged sexual assault of a girl. 2005 WL 6136440, at *2. The tenants raised a number of affirmative defenses to the unlawful detainer complaint, including that HACOLA had violated the Fair Housing Act, the California Fair Employment and Housing Act and Unruh Civil Rights Act by failing to provide a reasonable accommodation to their son based on his mental disability. HACOLA won the unlawful detainer trial. After the state court entered judgment, HACOLA allegedly proposed, and the tenants rejected, a settlement agreement that would have permitted them to retain possession of the apartment in exchange for their release of civil rights claims against HACOLA. Tenants later brought

11

a civil rights action against HACOLA in part based on the filing and prosecution of the unlawful detainer action. Judge Morrow found that HACOLA was protected by the *Noerr-Pennington* doctrine, including for its activity related to offering the post-judgment settlement: "[T]o the extent plaintiffs contend that defendants' offer to settle the issue of plaintiffs' right to possession of the apartment, either prior to filing the unlawful detainer action, during the pendency of that action, or *following entry of judgment*, constitute conduct that violates the FHA or Rehabilitation Act, their claims are barred by the *Noerr-Pennington* doctrine." *Id.* at *12 (emphasis added).

Attorney Defendants cite *Columbia* and *Thomas* in support of their argument that "relaying the proposed terms of the short sale to Plaintiff was conduct incidental to the actual settlement of the Underlying Action or, alternatively, enforcement of the settlement terms." Atty Def.'s Reply at 3 (*citing Columbia* and *Thomas*). However, neither case involves "enforcement of settlement terms." Both cases involve the offer and rejection of a settlement. In *Columbia*, the prior "petitioner" seeking to invoke the *Noerr-Pennington* doctrine – Columbia Pictures – rejected a prior settlement offer from PREI; in *Thomas*, the prior petitioner (HACOLA) had offered a settlement that was then rejected by the tenants. The offer and rejection of a settlement to resolve the claims raised in a petition are far more related to that petition then later actions taken pursuant to terms of a settlement agreement. Attorney Defendants do not offer, nor can the Court find, any cases that apply the *Noerr-Pennington* doctrine to actions simply authorized by a settlement agreement.

Attorney Defendants point out that the *Thomas* settlement was offered after judgment was entered in the unlawful detainer action. Again, that was the *offer* of a settlement, not actions taken pursuant to an agreement. More importantly, in an unlawful detainer action, the suit is not over until the tenants are out of the property. As Plaintiffs points out, post-judgment enforcement, including the issuance, service and posting of a writ of possession and execution of the writ by the sheriff, is the norm in unlawful detainer actions. The *Thomas* tenants retained possession of the home at the time the settlement offer was made. The offer was to allow plaintiffs to stay in the home. It therefore went to the heart of the unlawful detainer petition, i.e., the removal of the tenants from the home.

Here, the allegedly fraudulent communications regarding the proposed short sale were unrelated to the petitioning activity. The Foreclosure Action alleged that the beneficiary (Thornburg Mortgage

Home Loans, Inc.) and trustee under the deed of trust (Quality Loan Service Corporation, later substituted by SPS) issued a Notice of Default on the Sugarloaf Property without prior compliance with California Civil Code § 2923.5, which contains various notice and procedural requirements for issuance of a notice of default. Chu Decl., Ex. A (*Valentino v. Quality Loan Service Corporation* complaint) at ¶¶ 20-23. That case settled and was dismissed on September 12, 2012. One of the terms of the Settlement Agreement allowed Valentino to attempt to sell the home. According to the FAC, in attempting to sell the home, the Attorney Defendants, Valentino, and the Buyer Defendants attempted to defraud Plaintiffs by preparing a sham set of sale documents that hid the fact the house was to sell at a far higher price, with the extra money to be paid to Chu and a second-lien holder. FAC ¶¶ 34-36. This activity was unrelated to Valentino's petitioning activity regarding notice requirements of Cal. Civ. Code § 2923.5. In sum, the fraudulent communications were not "conduct incidental to the prosecution" of the Foreclosure Action. *Columbia Pictures*, 944 F.2d at 1528. The *Noerr-Pennington* doctrine does not apply.

Attorney Defendant's (and by joinder, Valentino's) motion to dismiss on the grounds of the *Noerr-Pennington* doctrine is DENIED.

### B. Anti-SLAPP

In the alternative, Attorney Defendants move to strike the FAC under California's "Anti-SLAPP" (Strategic Lawsuit Against Public Participation) statute. *See* Cal. Code of Civ. P. § 425.16. The California anti-SLAPP statute permits defendants to bring a "special motion to strike" if a cause of action against them arises "from any act . . . in furtherance of the . . . right of petition or free speech . . . in connection with a public issue," unless "the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1). "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *Id*. at § 425.16(b)(2). If a defendant prevails in bringing a motion to strike, that defendant "shall be entitled to recover his or her attorney's fees and costs." *Id.* § 425.16(c). Although it is a state statute, California's anti-SLAPP protections apply to state law claims brought in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,

13

190 F.3d 963, 971-73 (9th Cir. 1999). In evaluating an anti-SLAPP motion, courts engage in a two-part inquiry. "First, a defendant must make an initial *prima facie* showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech . . . Second, once the defendant has made a *prima facie* showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1110 (9th Cir. 2003).

The first part of the anti-SLAPP inquiry is substantially the same as the inquiry into whether the *Noerr-Pennington* doctrine applies. *See Kearney v. Foley and Lardner*, 553 F. Supp. 2d 1178, n.3 (S.D. Cal. 2008) ("[T]he *Noerr-Pennington* doctrine is analogous to California's Anti-SLAPP statute."). With the anti-SLAPP statute, the question is whether the challenged cause of action "arises from" protected activity. § 425.16(b)(1); *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1056 (2006). "In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal. 4th 69, 76 (2002).

For the same reasons that the Court found the *Noerr-Pennington* doctrine does not apply, discussed *supra*, the Court finds that the anti-SLAPP statute does not apply. The phrase "arising from" arguably covers less behavior than "conduct incidental to" the petitioning activity. The Court has already found that the allegedly fraudulent communications were not conduct incidental to the Foreclosure Action, and also finds that they were not based on nor did they "arise from" the Foreclosure Action. "If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." *Hylton v. Frank E. Rogozienski, Inc.*, 177 Cal. App. 4th 1264, 1272 (Ct. App. 4th 2009) (rejecting anti-SLAPP coverage for attorney where client brought claims against attorney for falsely advising client in underlying suit to receive an excessive fee). The allegedly fraudulent communications at issue in this case were, at most, "collateral" to the defendants' earlier petitioning activity. The anti-SLAPP statute does not apply.

### C. Litigation Privilege

Attorney Defendants further argue that the complained of activity is covered by California's

14

litigation privilege.[6] The litigation privilege, codified as California Civil Code § 47(b), provides in pertinent part that "a privileged publication or broadcast is one made in (1) any legislative proceeding, (2) judicial proceeding, (3) in any other proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law." According to the California Supreme Court, the purpose of the privilege is "to afford litigants . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213 (1999). The privilege bars all tort causes of action other than malicious prosecution and applies to any communication "(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Silberg,* 50 Cal.3d at 219-220 (the "Silberg test").

The first prong of the Silberg test is broad, covering "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Epistar Corp. v. Philips Lumileds Lighting* Co., 2008 WL 3930030, *6 (N.D. Cal. Aug. 26, 2008) (*citing Jacob B. v. County of Shasta*, 154 P.3d 1003, 1007 (Cal. 2007)) (citation omitted). The "other participants" described in the second prong includes non-litigants that possess a "substantial interest in the outcome of the litigation." *Costa v. Superior Court*, 157 Cal. App. 3d 673, 678 (1984). The California Supreme Court "has characterized the third prong of the [Silberg] test, the requirement that a communication be in furtherance of the objects of the litigation, as being 'simply part of' the fourth, the requirement that the communication be connected with, or have some logical relation to, the action." *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1141 (1996) (*citing Silberg*, 50 Cal. 3d at 219-220). The "connection or logical relation which a communication must bear to the litigation in order for the privilege to apply, is a functional connection. That is to say, the *communicative act* -- be it a document filed with the court, a letter between counsel or an oral statement -- must function as a necessary or useful step in the litigation process and must serve its purposes." *Rothman*, 49 Cal. App. 4th at 1134

---

[6]It is unclear if Attorney Defendants are raising the 47(b) privilege in the connection with the second part of the anti-SLAPP inquiry (whether plaintiffs have a probability of prevailing on their claims), or independently. The Court addresses it separately here.

15

(citations omitted).

Here, there was no functional connection between the fraudulent communications and the foreclosure litigation, because that litigation was over. Attorney Defendants argue that nonetheless, the litigation privilege can apply to statements made after proceedings have completed. Atty Def.'s Reply at 7 (*citing Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006)). In *Rusheen*, in the course of civil litigation in which the defendant was found to be a vexatious litigant, a default judgment was entered against him, and the plaintiff began executing on the judgment. Defendant then filed a cross-complaint against plaintiff's attorney, alleging that the attorney abused process by filing perjured documents related to the service of the vexatious litigant motion and unlawfully conspired to execute on the resulting default judgment. The court of appeals found the filing of the perjured documents was covered by 47(b), but that the alleged conspiracy to execute on the resulting default judgment was unprivileged conduct. The California Supreme Court reversed the latter decision, holding that the postjudgment enforcement activity was also covered by the litigation privilege. The court reasoned that the gravamen of the cross-complaint was the attorney's procurement of the default judgment through privileged communicative acts (the allegedly perjured declarations of service), and therefore the privilege should extend to "necessarily related noncommunicative acts" (the enforcement act of levying defendant's property). The court found that to rule otherwise would thwart the purpose of the privilege. *Id.* at 1062.

Here, however, Attorney Defendants were not engaged in enforcing a judgment resulting from the Foreclosure Action. There was no judgment in that litigation to enforce. The Attorney Defendants engaged in communications collateral to the performance of certain settlement obligations placed on them. Indeed, the situation is the opposite of *Rusheen* - here, the only obligations to enforce rested on Valentino and Attorney Defendants; there was nothing for Attorney Defendants to enforce against Plaintiffs. In any case, there was no judgment requiring enforcement. The Court finds that the litigation privilege is inapplicable here, where the allegedly fraudulent communications took place independently from the protected judicial proceedings.

Attorney Defendant's (and by joinder, Valentino's) motion to dismiss on the grounds of the California's anti-SLAPP statute and the litigation privilege is DENIED.

### 2. Buyer Defendants' Motion to Dismiss

The Buyer Defendants (Nesbitt and Neszhao Consulting) move separately to dismiss. The Buyer Defendants essentially present two theories as to why the FAC should be dismissed. First, they argue that all of the claims related to the fraud are implausible as against them because it was their real estate agent that blew the whistle the fraudulent behavior. They argue that "plaintiffs have not alleged, and cannot allege, a plausible claim that the Buyer Defendants committed the fraud that, in fact, the Buyer Defendants themselves revealed to the Plaintiffs." Buyer Def.'s MTD at 6. Second, Buyer Defendants argue that Plaintiffs' fifth claim for tortious interference with prospective economic advantage arising from Buyer Defendants' failure to pay Valentino rent while they lived at Sugarloaf fails because the Court can infer from a separate lawsuit (and take judicial notice thereof) that the Buyer defendants did, in fact, pay rent. Related to the second theory, Buyer Defendants also argue that nothing in the complaint suggests Buyer Defendants knew their rental payments were the only source of money for Valentino to make his payments to Plaintiffs.

Plaintiffs argues that both theories fail. Regarding the first theory, Plaintiffs argue that nothing in the complaint suggests that the Buyer Defendants' real estate agent was acting on behalf of the Buyer Defendants. Plaintiffs argue the proper inference to be drawn is that the agent was actually blowing the whistle on his own clients to protect himself. Regarding the second theory, Plaintiffs argue that the appropriate inference to be drawn from the FAC is that the Buyer Defendants were aware that their rent payments were necessary for Valentino's monthly payments to Plaintiffs because the FAC alleges that the Buyer Defendants were aware of the material terms of the settlement agreement. FAC ¶ 25.

Plaintiffs request, in the alternative, that the Court allow them to amend the FAC to clarify the allegations regarding Buyer Defendants. The Court finds that amendment of the complaint is necessary. It is unclear from the complaint whether Buyer Defendants' agent was acting on behalf of Buyer Defendants. It is also not clearly alleged that Buyer Defendants' knew that their own rental payments were necessary for Valentino's payments to Plaintiffs, a necessary component of an intentional interference claim. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). Both defects can be cured with amendment. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701

(9th Cir. 1988) (leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect). The Court therefore GRANTS Buyer Defendants' motion to dismiss, WITH LEAVE TO AMEND.

Buyer Defendants also request that the Court take judicial notice of a state court complaint filed by Valentino against them, alleging that they did not pay the $14,000 a month rent for the last third of December 2011, or January or February 2012. *See* Buyer Defendants' RJN, dkt. 41-2. Buyer Defendants then ask the Court to infer from this complaint that rent was paid for November and the first 2/3rds of December 2011, and therefore, Plaintiffs' claim is implausible. Buyer Def.'s MTD at 3. The Court will take judicial notice of the complaint, because it is "not subject to reasonable dispute." Fed. R. Civ. P. 201. The Court will not, however take judicial notice of an inference to be drawn from the allegations in that complaint. A court "may not take judicial notice of a fact that is subject to reasonable dispute." *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Judicial notice of that inference is improper.

In sum, the Court GRANTS WITH LEAVE TO AMEND Buyer Defendants' motion to dismiss. Any amended complaint must be filed by **July 6, 2012**.

**IT IS SO ORDERED.**

Dated: June 20, 2012

SUSAN ILLSTON
United States District Judge